## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE SEARCH OF: | ) | |
| | ) | |
| ZTE SMARTPHONE, BLACK AND BLUE, IN COLOR, | ) ) | MAGISTRATE NO.  16-1067M **UNDER SEAL** |
| | ) | |
| VERIZON SAMSUNG TELEPHONE, BLACK IN COLOR, | ) ) | MAGISTRATE NO.  16-1068M **UNDER SEAL** |
| | ) | |
| | ) | |
| LG SMARTPHONE, BLACK IN COLOR | ) ) | MAGISTRATE NO.  16-1069M **UNDER SEAL** |
| | ) | |
| INSTALLED TOUCHSCREEN GPS UNIT, BLACK IN COLOR | ) ) | MAGISTRATE NO.  16-1070M **UNDER SEAL** |

### AFFDAVIT

I, Timothy K. Nave Jr., a Special Agent with the Drug Enforcement Administration ("DEA"), Pittsburgh, Pennsylvania, being duly sworn, depose and state as follows:

### A.    Introduction and Agent Background

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I am also a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

2.      I have been a Special Agent with the DEA since April 2008.  I have received formal basic agent training as part of Basic Agent Class 178, at the DEA Academy located in Quantico, VA.  I am currently assigned to the DEA Pittsburgh District Office, and have been so assigned since July 2015.  I had previously been assigned to the DEA Imperial County District Office in California from October 2008 through July 2015.  Prior to my employment with DEA, I was a Counterintelligence Investigator with the Department of Defense.

3.      I have been involved in narcotics related arrests and the execution of search warrants which resulted in the seizure of narcotics and assisted in the supervision of activities of informants who provided information and assistance resulting in drug buys.

4.      I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, undercover techniques, white collar crimes, search warrant applications, and various other crimes.

5.      In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing pen register data, conducting court-authorized wire and oral interceptions and electronic surveillance, and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

6.      In connection with my work for the DEA, I have worked with federal, state and local law enforcement officers in the Western District of Pennsylvania and other jurisdictions, including law enforcement officers in other countries. These personnel provide the DEA with an extensive breadth of experience and knowledge about illegal interstate and international drug trafficking.  Through my experience, training and interactions with other law enforcement officials, I have become familiar with the methods of operation typically utilized by individuals who distribute illegal drugs.

7.      I am aware that evidence of federal crimes, including firearm crimes, can often be found in electronic media, including cellular telephones and GPS devices.  Such evidence can be found throughout a device, such as in text messages, contact lists indicating the names and numbers of associates, call/text logs indicating calls/texts made to and received from associates, online search history files, and photograph and video gallery files.  It should be noted that, with the advance of technology, the distinction between computers, cellular telephones, and other devices is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging and photographing, can now be performed from many cell phones.  The particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of criminal activity.  Such numbers can confirm identities of particular associates and the occurrence of certain events.

8.      As with most electronic/digital technology items, communications made from an electronic device, such as a cellular telephone or a standard computer or GPS unit, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving a text message or a contact or an e-mail.  Digital information can also be retained unintentionally.  Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or cellular telephone.  In addition to electronic communications, a user's internet activities generally leave traces in the web cache and internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, stored, deleted, or viewed.

9.      I am aware that criminals sometimes take trophy photographs and videos using their cellular telephones of their contraband, firearms, and proceeds and retain them on their cellular telephones.  I am also aware that such criminals, like law-abiding citizens, sometimes take photographs and videos using their cellular telephones of themselves with their friends, relatives, and associates and keep the photographs on their cellular telephones.  When they are taken or retained by criminals, such photographs and videos can be evidence, and can lead to additional evidence, of illegal activity by identifying the perpetrators, contraband, and people who are actively assisting and/or supporting the criminal activity as well as the locations where they live or where they store their contraband, firearms, proceeds, or paraphernalia.

10.      I know that it is common practice for narcotics traffickers to routinely utilize telephones and cellular telephones to sell narcotics.  Narcotics traffickers utilize cellular telephones to speak with customers as well as co-conspirators, and further, narcotics traffickers frequently use text messages to conduct business as well.  In fact, because narcotics traffickers use text messages very heavily to communicate with both customers and suppliers, it is my experience that the text messages contained in a narcotics trafficker's cellular phone frequently provide law enforcement with a "paper trail" detailing a person's drug sales.  In this instance, the electronic data contained within the subject telephones and the installed GPS unit could provide critical evidence linking these individuals to other narcotic traffickers, to include but not limited to this DTO's source of supply.

11.      I am currently participating in the investigation of the Angelo EVERETT Drug Trafficking Organization (hereinafter "the EVERETT DTO"), a drug trafficking organization operating in the Western District of Pennsylvania.   The Organization includes Angelo

4

EVERETT (a/k/a "Lo"), Marieo EVERETT (a/k/a "Star"), Jevon EVERETT (a/k/a "Poops"), Brent WILLIAMS (a/k/a "Lil Geeze"), Ronnie MCGILL (a/k/a "Rude Boy"), Brianna TIMBER, Auriana TORREZ, Shyann JOHNSON, Ada JOHNSON, Jenkins EVERETT (a/k/a "JINX" or "JENKS") and others both known and unknown (hereinafter "Target Subjects"). Several members of the EVERETT DTO have been indicted on conspiracy charges (21 U.S.C. § 846) in the Western District of Pennsylvania. These individuals are Marieo EVERETT, Jevon EVERETT, Ronnie MCGILL, Brianna TIMBER, Auriana TORREZ, Raphael Rodriguez, and the suspected owner of the items to be searched, Angelo EVERETT.

12.     This affidavit is made in support of a search and seizure warrant for three (3) cellular telephones and one (1) installed GPS unit located during an inventory of a 2013 Toyota Camry, black in color, bearing Pennsylvania Registration: JZN-4576 (hereafter "SUBJECT VEHICLE"), registered to Lavasia Denene JACKSON ARNOLD, of 8337 Pierce St, Verona, PA 15147, in which Angelo EVERETT (A. EVERETT) was travelling in at the time of his arrest.

13.     The statements contained in this Affidavit are based on my experience and background as a Special Agent, my interviews with witnesses, review of documents, reports, and records, and based upon my discussions with other law enforcement agents.

14.     This Affidavit has been prepared for the specific purpose of supporting an application for a search and seizure warrant for three (3) cellular telephones and an installed GPS unit located in the dashboard of the SUBJECT Vehicle. I have not, therefore, included every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause.

**B.    IDENTIFICATION OF ITEMS TO BE EXAMINED**

15.    SUBJECT TELEPHONE 1, found in the SUBJECT VEHICLE pursuant to an inventory of said vehicle, is described as a ZTE wireless telephone, black and blue in color. SUBJECT TELEPHONE 1, discovered on the center console of the SUBJECT VEHICLE during an inventory.  SUBJECT TELEPHONE 2, found in the trunk of the SUBJECT VEHICLE pursuant to an inventory of said vehicle, is described as a Verizon SAMSUNG flip phone, black in color. SUBJECT TELEPHONE 3, found in the trunk of the SUBJECT VEHICLE pursuant to an inventory of said vehicle, is described as a LG wireless telephone, black in color. The INSTALLED GPS UNIT, mounted in the dashboard of the SUBJECT VEHICLE, is described as a touchscreen GPS Unit, black in color.  Collectively, these items will be referred to as the "Devices."

**C.    TECHNNICAL TERMS**

16.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone

6

numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.    GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.

17.    Based on my training, experience, and research, I know that these Devices have capabilities that allow them to serve as wireless telephone, digital cameras, and GPS navigation devices, amongst others.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests: who a suspect was communicating with at the time of his arrest for drug trafficking (as well as the substance of those conversations) and in the days leading up to his arrest, who his co-conspirators were in this crime, the names, addresses and locations of his narcotics' suppliers and customers, and photos and videos of evidence related to drug trafficking.  In this instance, these devices may assist law enforcement in identifying the sources of supply being utilized to resupply the EVERETT DTO.

### D. CURRENT INVESTIGATION

18. For approximately the past 10 months, the DEA Pittsburgh District Office (PDO), and the City of Pittsburgh Bureau of Police have been investigating a group of individuals in the Hill District neighborhood of Pittsburgh who are distributing heroin. During the course of this investigation, Marieo EVERETT (hereafter "M. EVERETT"), J. EVERETT, and MCGILL have been identified as mid-level drug traffickers in the Hill District neighborhood, whose source of supply is Angelo EVERETT (hereafter "A. EVERETT"). A. EVERETT is supplied, at least in part, by larger scale drug traffickers in the New York or New Jersey area. At this time and based on CS information, it is believed that M. EVERETT and A. EVERETT are brothers, and J. EVERETT and Jenkins EVERETT are cousins of the other EVERETTS. It is believed that MCGILL is a close family friend to the EVERETT DTO.

19. Starting in April 2016, orders were issued in the Western District of Pennsylvania by the Honorable Arthur J. Schwab, at Misc. Nos. 16-370, et seq., authorizing the interception of wire and electronic communications over eight (8) Target Telephones ("TT's") used by the Target Subjects to communicate with each other. The wiretap investigation, in conjunction with other investigative techniques such as physical surveillance, resulted in the interception of thousands of telephone calls and hundreds of text messages, many of which revealed that the Target Subjects and their associates are extensively involved in heroin trafficking on a daily basis. Some of these intercepted telephone calls and text messages are referenced in this affidavit. The context and meaning of many of these intercepted communications are explained herein. The explanations are based upon my training and experience and my involvement in this

and other investigations, as well as upon other agents' training, experience, and involvement in this and other investigations.

20.     My belief that A. EVERETT and M. EVERETT receive their heroin from a source in the New York area has been supported by the recent interceptions, which have occurred over TT#8 (724-671-0003), used by A. EVERETT.  On August 17, 2016, at 1:14 p.m., A. EVERETT spoke with the user of a telephone with the number (347) 759-1935:

```
UM: Yo
AE: What up (S/L) G-Money
UM: What's up buddy?
AE: Shit, Chillin, Chillin. How we looking? (Coughing)
UM: Everything, (S/L) everything is breathing
AE: (Coughing) Is it something new?
UM: Yeah
AE: Yeah, that last shit was really (Coughing) (I/A)
UM: Huh?
AE: (Coughing) The last shit was like a 6.
UM: What? The one I just gave?
AE: Yeah. Like a 6 or 7. Well from what, what that last shit I
had, you already know how they gonna be. I
had to ween them off that shit. Yeah, I uh, shhh, I aint even
doing any shit, I fuck around and slid up on
you, you know what I mean?
UM: Alright
AE: I'll call you ahead of time, before I leave, though.
UM: Ok
AE: Alright
UM: You talk, you talk to your brother right?
AE: Yeah i talked to him, umm, yesterday. He said he is waiting
for you to call him back.
UM: Oh
AE: Um, I'll, I'll, I'll tell him everything. You talk to him
today?
UM: I spoke with him yesterday.
AE: Oh alright, alright, alright. Well, ahh, is it raining up
there?
UM: Nah
AE: Raining like a motherfucker down here. Alright, uhh, I'll
call you and let you know where, I'm going to see what he is
doing too, before I leave.
```

9

UM: Alright
AE: Alright

I believe this call shows that A. EVERETT is looking for a new batch of heroin with higher potency ("Is it something new?") because the last batch supplied by the unidentified male to A. EVERETT was not well received by heroin users, who would rate it as a 6 or 7 on a hypothetical scale measuring potency from 1 to 10.  I am aware that heroin distributors use the scale from 1 to 10 in order to seek feedback from users concerning the potency and therefore popularity of a particular batch of heroin.  The day before A. EVERETT engaged in the conversation quoted above, he fielded complaints from customers, including one who told him that the heroin supplied by A. EVERETT rated only "a six on the scale" and "ain't like no … knock you out joints."  I also believe that the call quoted above shows that A. EVERETT and M. EVERETT both communicate with and receive heroin from the same supplier of heroin in the New York area, as evidenced by the fact that the unidentified male asks A. EVERETT about his "brother," who the male "spoke with…yesterday."   A. EVERETT's offer to "see what he's doing too, before I leave" shows that A. EVERETT will work with M. EVERETT to coordinate the re-supply of heroin from the unidentified male.  Earlier in the wiretap investigation, A. EVERETT and M. EVERETT discussed making trips in a cooperative fashion.

21.     During the weekend of August 26-28, 2016, agents and officers intercepted several calls indicating that A. EVERETT had traveled to the New York City area in an attempt to resupply the EVERTT DTO with heroin.  On August 26, 2016, at approximately 8:32 p.m., A. EVERETT placed a call on TT#8 (VoLTE Session 2573) to an Unknown Male (UM) utilizing a New York area code phone number, 347-759-1935, which is the same number in the

conversation quoted above. A. EVERETT expressed that he was going to "slide up" but it would be "3 o'clock in the morning" by the time he would get there. UM replied "you aint coming nowhere, Lo," and made several jokes about A. EVERETT going to the bar instead. UM stated that his son was being baptized in the morning and he wouldn't be available until after the baptism. A. EVERETT assured UM that he would leave in the morning, that A. EVERETT was "empty," and then asked UM if he would be at his "new crib" or his "old joint?" UM stated that he would be at his "new one." Your affiant believes that this showed that A. EVERETT had been dealing with this particular UM for his heroin resupplies for a long time, and that A. EVERETT knew that UM had changed addresses.

22.     At approximately 10:06 p.m., the reporting agent observed the lights of the SUBJECT VEHICLE turn on, and could note an individual standing on the curb of the vehicle. At approximately 10:14 p.m., the driving lights of the vehicle turned on and the vehicle pulled out and left the area. Based on prior calls, it appeared A. EVERETT would stop to visit a friend in the Washington D.C. area prior to heading to New York. Pursuant to the above mentioned wiretap authorization, agents were able to receive GPS data from TT #8. Over the next several hours, GPS location pings from TT#8 indicated that A. EVERETT did in fact go to the Washington D.C. area. On 8-27-2016, at approximately 5:25 p.m., A. EVERETT placed a call on TT8 (VoLTE Session 2667) to indicted co-conspirator Auriana TORREZ utilizing phone number, 412-339-8286. TORREZ asked A. EVERETT where he was and A. EVERETT responded that he "just got to V's." At the time of this call, cell tower information showed that TT8 was in the vicinity of New York City's Bronx Borough. TORREZ then complained to A. EVERETT that he had left her. Your affiant believed that A. EVERETT's source of supply is

"V" and TORREZ was complaining that he had left her behind and she wanted to go to New York with him.

23.     A. EVERETT received a call on August 28, 2016 at approximately 8:59 p.m. on TT8 (VoLTE Session 2878) from another Unknown Male (UM2) utilizing phone number, 412-295-4405. During this call, UM2 told A. EVERETT that he went to A. EVERETT's cousin to get what he needed. This call allowed agents to observe that TT8 was now utilizing a cell tower near the airport in Newark, New Jersey. Agents relayed that information to the Pennsylvania State Police (PSP) SHIELD Team. PSP SHIELD Team set up on the west bound side of the Pennsylvania Turnpike and conducted a traffic stop on A. EVERETT's Toyota Camry, which A. EVERETT was driving when it was stopped.  During the course of a consent search of the SUBJECT VEHICLE Troopers discovered approximately 180.1 grams of heroin concealed in an aftermarket concealed compartment under the front passenger seat of the Toyota Camry. Troopers placed A. EVERETT under arrest and transported the SUBJECT VEHICLE to the PSP Barracks in Greensburg, PA.

24.     On October 21, 2016, your affiant and Task Force Officer (TFO) Dorian Merlina transported the SUBJECT VEHICLE to the City of Pittsburgh Bureau of Police Secured Storage Warehouse.

25.     On November 16, 2016, your affiant and TFO Merlina conducted an inventory of the vehicle pursuant to asset forfeiture regulations and discovered SUBJECT TELEPHONES 1, 2, 3 and noted identifying features of the GPS Device.

26.     Although there were two women in the car along with A. EVERETT when it was stopped, your affiant believes that all three SUBJECT TELEPHONES belonged to A. EVERETT

and will contain evidence relevant to his drug trafficking. Based on my training and experience, I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement to routinely utilize multiple telephones in order to communicate with their customers, suppliers, couriers, and other conspirators. It is not unusual for drug traffickers to initiate or subscribe such phone or phone device services under the names of other real or fictitious people. It is also not unusual for drug traffickers to retain multiple cellular phones at a time, in order to communicate with different parties. During the wiretap, the Court authorized wiretaps on three different phones used by A. EVERETT, and the location of the three SUBJECT TELEPHONES in the center console and in the trunk suggests that these were not personal telephones used by the female passengers. Both female passengers claimed other phones to be theirs, and did not claim the SUBJECT TELEPHONES.

### E.    ELECTRONIC STORAGE AND FORENSICS ANALYSIS

27.    Based on my knowledge, training, and experience, I know that electronic devices such as the SUBJECT TELEPHONES and the GPS Device can store information for long periods of time. This information can be recovered with forensics tools.

28.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, such as call logs, contact lists, and text messages, but also forensic evidence that establishes how and where the Devices were used, the purpose of their use, who used them, and when they were used. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a.  Data on the storage medium can provide evidence of files that were once on the storage medium but have since been deleted or edited, or of a deleted portion of a file.

13

b.  A person with appropriate familiarity with how an electronic device works may, after examining the recovered forensic evidence in its proper context, be able to draw conclusions about how the electronic Devices were used, the purpose of their use, when they were used, and critically, where they were used.  The determination of where the Devices were used is critical to this investigation and the determination of "where" the Devices were used could lead law enforcement identifying additional pharmacy burglaries, stash locations and the location of the crews drug distributors.

29.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

30.    *Manner of execution.*    Because this warrant seeks only permission to examine the Devices that are already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31.    Based on the information above, there is probable cause to for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

32.    The above information is true and correct to the best of my knowledge, information, and belief.

Timothy K. Nave Jr, Special Agent
Drug Enforcement Administration

Subscribed to and sworn before
me this 17th day of November, 2016.

Honorable Lisa Pupo Lenihan
United States Magistrate Judge
Western District of Pennsylvania

15

## **ATTACHMENT A**

The Devices to be searched are: 1.) a ZTE Smartphone, black and blue in color; 2.) a Verizon Samsung flip phone, back in color; 3.) a LG Smartphone, black in color; and 4.) a touchscreen GPS Unit, black in color, installed in the center of the dashboard of the SUBJECT VEHICLE.

This warrant authorizes the search and forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records, items, and data on the Devices described in Attachment A, including but not limited to the following:

   a.  Text messages, recent call lists, voicemails and contacts lists;

   b.  Pictures and videos;

   c.  Lists and phone numbers of customers, co-conspirators and related identifying information;

   d.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   e.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   f.  Internet, browser, or keyword searches;

   g.  GPS or location data related to mapping software or the physical location of the Devices;

   h.  Information stored in social media applications or geolocation applications.

2.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.      All of the above items constitute or may constitute evidence of violations of 21 U.S.C. §§ 841 (a) (1) and (b) (1) (C) (related to possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (related to the attempt and conspiracy to possession with intent to distribute controlled substances).